## WALSH *v.* WASHINGTON MARINE INSURANCE COMPANY.

32    427
118    430
118    458

The question whether a vessel insured was seaworthy at the inception of the voyage, is ordinarily one of fact for the jury.

Where the inability of a ship to perform its voyage becomes evident soon after leaving port, and it founders without stress of weather, or other adequate cause of injury, the presumption is that this inability existed before setting sail, and arose from some latent defect which rendered the vessel unseaworthy.

But no such presumption exists where it appears affirmatively that the ship was seaworthy on leaving port, and that it encountered marine perils such as might disable a staunch and well manned vessel.

A policy of insurance issued *on account of whom it may concern* ordinarily inures to the benefit of all the owners; and an action may be maintained in their behalf by the party to whom it is issued, suing in his own name.

In such a case, when the interests of the owners are erroneously stated in the complaint, the court, in its discretion, may permit an amendment of the pleadings on the trial in conformity with the facts proved.

Where an insurance is effected by one for the benefit of himself and other owners, it is not a fatal objection to the sufficiency of the notice and preliminary proofs that the other owners do not unite in presenting them, or that changes in their respective interests are not stated in the proofs presented by the party to whom the policy was issued for the benefit of all the owners.

The provision in policies of insurance, requiring notice and proof of loss and interest, is to be expounded liberally in favor of the assured; and its requirements are satisfied by furnishing such reasonable evidence as the party can command at the time, to give assurance to the underwriters of his right to receive the money, and of their liability for the loss.

The testimony of experienced navigators is admissible on questions involving nautical skill, of the nature and ordinary effects of the perils to which a marine loss is attributed.

THE action was on a policy of insurance upon the ship Senator, on a voyage from New York to Liverpool. The defense was, that the vessel was unseaworthy at the inception of the risk. It was 15 years old at the date of the insurance, and an extra premium was taken for that cause. The ship had been successful in all its previous voyages, and had delivered its cargoes in good condition. It had met with occasional injuries, but none of a serious character, and they were always promptly repaired. When these repairs were made from time to time, the vessel was examined by

the shipwrights, and was always found to be strong, staunch and sound. She had been well built of the best materials, and was known as one of the best ships that sailed from New York. She had arrived from Liverpool, shortly before she was insured, laden with nine hundred tons of salt in bulk, which was delivered dry and in good condition. The ship was to carry out on her next voyage a cargo of grain in bulk and in bags. She had been purchased not long before by her then owners for $38,000; and they insured her in valued policies for $35,000, of which $5,000 was taken by the defendants. It was proved affirmatively that the vessel was seaworthy, and well manned and equipped when she left port, on the 22d of August, 1862, and there was no conflict on the trial in the direct evidence on this subject. There was some leakage when she sailed; but it was proved and undisputed that this was due to her lying up unladen for some weeks in the dry season, while waiting for her outward cargo, and that under such circumstances leakage was usual with seaworthy vessels on leaving port.

There was a conflict of evidence as to whether her loss four days afterwards was caused by the perils of the seas. If the testimony adduced by the plaintiff was true, she encountered difficulties which were sufficient to disable a seaworthy vessel, and account fully for her foundering. If the testimony of the two mates, who were sworn for the defendants, was true, she had a smooth sea and a favoring breeze from the time she left port until she sunk.

The evidence of the mates was discredited by the fact that on the trial, as well as in a previous criminal proceeding, they swore that the ship was scuttled by the master. This was assumed to be false by the defendants who called them; as they attributed the loss to unseaworthiness at the commencement of the voyage. One of these witnesses, the chief mate of the vessel, claimed to have sworn falsely on a previous occasion, when he made oath to the truth of the protest, which showed the loss to have been caused by marine perils. The testimony of both these witnesses was discredited by other facts, sufficiently stated in the opinion.

The jury found a verdict for the plaintiff. A motion for a new trial on the facts was denied by the judge before whom the cause was tried, and his decision was affirmed on appeal to the General Term.

Various subordinate questions arose in the course of the trial, and the facts material to these, as well as to the principal question of unseaworthiness, are referred to in their appropriate connection in the opinion.

Exceptions were taken to the admission of portions of the evidence, to the denial of the motion for a nonsuit, to the refusal to instruct the jury in accordance with one of the defendant's requests, and to the submission to the jury of such evidence as had been objected to in the course of the trial.

*William D. Booth*, for the appellant.

If the inability of the ship to perform the voyage becomes evident immediately after leaving port, or in a short time after the risk commences, without any apparent cause of injury, the presumption is that this inability has arisen from causes existing before setting sail, and that the ship was unseaworthy. (3 Phill. Ev., 278; 4th Am. ed., and cases.)

It appearing from evidence that the vessel was lost by springing a leak and foundering in moderate weather, the presumption is that this arose from weakness or internal defect, and the burden of proof is thrown upon the insured. (*Paddock* v. *Franklin Ins. Co.*, 11 Pick., 227; *Copeland* v. *N. E. Ins. Co.*, 2 Metc., 237; *Cort* v. *Del. Ins. Co.*, 2 Wash. C. C., 48; *Warren* v. *United States Ins. Co.*, 2 Johns. Cas., 231.)

The onus is on the plaintiff to show both that she was seaworthy when she sailed, and that her loss was occasioned by some extraordinary peril. (*Cort* v. *Del. Ins. Co.*, *supra*; *Donnel* v. *Ins. Co.*, 3 Sumn., 366; *Prescott* v. *Union Ins. Co.*, 1 Whar., 399.)

*Elbridge T. Gerry* and *Wm. Curtis Noyes*, for the respondents.

When a vessel deeply ladened founders at sea, after springing a leak in heavy weather in consequence of straining and roll-

ing for a long time, the presumption that her loss arose from unseaworthiness at the inception of the voyage does not arise.

To raise such a presumption *particular* facts must appear in the case from which the inference of law arises, that the ship *must have been unseaworthy* at the inception of the voyage. (See *Patrick* v. *Hallett*, 3 Johns. Cas., 76; but see *S. C.*, 1 Johns., 241; *Paddock* v. *Franklin Ins. Co.*, 11 Pick., 227; *Barnwell* v. *Church*, 1 Cai., 217, 520; *Talcott* v. *Com. Ins. Co.*, 2 Johns., 124, 467; *Cort* v. *Del. Ins. Co.*, 2 Wash. C. C., 375; *Wright* v. *Orient Mut. Ins. Co.*, 6 Bosw., 269.)

The insured only warrants the seaworthiness of the vessel at the inception of the voyage; and if afterwards, from any cause, the vessel becomes unseaworthy, the underwriters are liable; and having proved seaworthiness at the inception of the voyage, the right to recover on the policy is established. (*Sherwood* v. *Ruggles*, 2 Sandf. S. C., 55, in point; 1 Marshall on Ins., 156–160; 1 Arnould on Ins., by PERKINS, § 245; *Potter* v. *Suffolk Ins. Co.*, 2 Sumn. C. C., 197; *Miller* v. *Russell*, 1 Bay, 309; *Am. Ins. Co.* v. *Ogden*, 20 Wend., 287.)

The assured need not show affirmatively the exact cause of the loss, after proving her seaworthiness at the time of her clearance.

PORTER, J. On the morning of the 22d of August, 1862, the ship "Senator" left the port of New York, laden with grain, and bound for Liverpool. On the morning of the 26th of August, the vessel was in a sinking condition, with nine feet of water in her hold, and the pumps clogged with grain. The officers and crew were rescued by a Prussian bark; and within an hour afterwards the ship went down with its cargo, at a distance of a hundred and twenty miles from the nearest coast.

The claim of the plaintiff under the policy of insurance, gave occasion for three theories as to the cause of the loss: 1. That the ship was seaworthy on leaving port, and foundered in consequence of injuries by marine perils against which she was insured. 2. That she was scuttled by the master, who was not aware of the insurance, in the hope of being

promoted by the owners to the command of a better vessel. 3. That she went down in fair weather and a smooth sea; that the loss must therefore be attributed to some secret defect, and that her foundering on the fourth day after leaving port raises a legal presumption, which overcomes the affirmative proof that she was seaworthy at the inception of the voyage.

Incongruous as these theories were, there was positive evidence in support of each. The *first* was that maintained by the plaintiff, sustained on the trial by credit-worthy witnesses, concurred in by the jury, and approved, on review of the facts as well as the law, by the judge who tried the cause, and by the court below on appeal.

The *second* of these theories was not urged by the defendants on the trial, as there was no pretense that the ship was scuttled by collusion with the owners, and the barratry of the master was one of the perils expressly enumerated in the policy. It derives its sole importance from the fact that the witnesses, who made the false accusation against the master before another tribunal, were those on whose testimony the defendants must rely for the facts on which they rest their theory of presumptive unseaworthiness.

The charge of the court was acquiesced in throughout by the defendants, except in submitting to the jury a portion of the evidence to which a general objection had been taken at the time it was offered. All the instructions they requested, except one which was plainly inadmissible, were approved and adopted by the presiding judge, in the precise form in which they were framed.

The jury having found for the plaintiff, and the court below having approved the finding upon the facts, there would seem to be no serious question for consideration here, in regard to the seaworthiness of the vessel; for it is agreed by all the authorities that this is peculiarly a question of fact for the jury. (1 Arnould on Ins., § 256; *Treadwell* v. *Union Ins. Co.*, 6 Cow., 273; *Patrick* v. *Hallett*, 1 Johns., 241; *Sherwood* v. *Ruggles*, 2 Sandf., 55.)

But it is claimed that the facts proved raise a legal pre-

sumption of unseaworthiness, which must overcome the force; not only of the plaintiff's evidence, but of the finding by the jury, with the concurrence of the court below, that the vessel was seaworthy in fact at the commencement of the voyage. This may properly be considered as a question of law, involved in the decision of the motion for a nonsuit, which was made when the plaintiff rested, and renewed at the close of the evidence. It is one easy of solution, when the leading features of the case are brought to view.

In considering it, we must exclude all such facts as rest for support on the testimony of the two mates, Schute and Thompson. Both were plainly guilty of perjury; and they claimed for themselves the additional infamy of being accomplices in a capital crime. It is impossible to read their testimony and compare it with the other evidence given on the trial, without arriving at a clear conviction that, from base and venal motives, they conspired to make an unfounded accusation against an innocent man, and that, in order to give an air of plausibility to the charge, they deliberately assumed to have been participants in the guilt which they falsely imputed to another, confident of their own immunity, and looking for money as the price of self degradation. Thompson had been in prison in Australia, and his antecedents were those of an impenitent thief. Schute professed, on the trial, to have previously committed perjury; and the general character of his testimony clearly indicated that, whether this was true or not of the particular occasion to which he referred, he was entirely capable of the crime.

The accusation against the master bore the impress of falsehood on its face. The imputed motive for the offense was his desire to commend himself to the owners of the Senator for promotion to a better command, by sinking a ship which he did not know to be insured, and which they had recently purchased at a price exceeding by $3,000 the entire amount of the insurance valuation. He is represented as voluntarily confiding to these men, in advance, his purpose to commit a capital offense; and this, without holding out to them any prospect of advantage or any inducement to secresy.

They represent him as consummating his crime, with the aid of one and the privity of both, at a hopeless distance from land, trusting his life and theirs to the chance of being rescued from a scuttled and sinking ship by some passing ocean wayfarer.

It happened in this, as in most cases of deliberate fabrication, that the falsehood of the witnesses was exposed by their inability to adjust the details of their narration so as to harmonize with the truth of the principal fact. Captain Cunningham was represented to have made auger holes in the ship's bottom at points wholly inaccessible—that portion of the hold being filled with grain in bulk. He was represented as boring several of these holes in ten minutes, with a single auger and through a thickness of twenty inches. The physical impossibility of accomplishing this evidently did not occur to the witnesses until they were confronted by the testimony of the shipwrights, who explained the difficulty of boring through the bolted frame of a vessel of that description, and the impracticability of penetrating it a second time with an auger that had once been forced through the heavy copper sheathing. It is quite evident that even if the vessel had been entirely empty, he could not have accomplished in a day, with the auger he is described as using, the task which he is said to have completed in ten minutes when the hold was filled with grain.

The witnesses perceived the necessity of giving some plausible explanation of an act so improbable as the deliberate scuttling of a ship in the open ocean, with no probable means of escape from death. This difficulty they met with the ready invention that the captain and Schute fitted plugs to the holes, which they inserted and withdrew from time to time, thus controlling at pleasure the ingress of water from the ocean. It did not occur to them to explain how this prudential adjustment would be practicable with from six to nine feet of water in the hold. But the evidence of the shipwrights shows that plugs a foot in length, such as the witnesses describe, inserted in twenty-inch holes, could not by possibility arrest the rush of water between the ceiling

and the timbers, or retard the sinking of the ship. Their evidence also shows that a plug inserted in an aperture of this description, would necessarily swell from the effect of the water, and it would not be possible for Schute to withdraw it from time to time, as he claims to have done, even if he had possessed the strength of an hundred men. If the story of these men had been true, and the vessel had been thus scuttled on the second day of the voyage, they would have all gone down together before the third day dawned.

These are the two witnesses who testify that the ship was lost on a voyage over a smooth sea and with a steadily favoring breeze. One of them, only seven days after the Senator went down, united with the master, the steward and the seamen in verifying the protest, detailing the precise marine disasters which caused the loss, and these evidently transcribed, in substance, from the log-book in which they were recorded as they occurred.

The testimony of the two mates being discarded, there is no evidence in the case to warrant the application of the rule of presumption invoked by the defendants. They insured the ship against the perils of the seas. They required the payment of an extra premium, for the reason that the vessel was fifteen years old, a fact which, in their judgment, increased the probability of loss from exposure to those perils.

It was claimed, on the argument, that even if the loss was caused by stress of weather, the assured is not entitled to indemnity, unless the perils encountered were of an extraordinary character. The accuracy of the proposition depends upon the sense in which the terms are employed. Storms are among the ordinary perils of the seas. But if a vessel be seaworthy on leaving port, and becomes unseaworthy within twenty-four hours afterward, by the force of an ocean gale, though she outlives the storm, the insurers are still liable if, in consequence of the injury, she goes down afterwards in a dead calm. The special hazards which may attend a particular voyage are necessarily unforeseen, as well by the assurers as the assured; but it is perfectly understood by both, that every ship leaving port for an ocean voyage, is exposed to known

and familiar perils, which may prevent its return. It is because these hazards are as ordinary on the sea as fires on the land, that policies are issued by the insurers and paid for by the assured.

All, therefore, that the law requires of the owner in this regard is, that the ship be seaworthy on leaving port, properly manned and equipped, prepared to meet the perils ordinarily incident to ocean navigation; and if, in the particular voyage, these prove too great to be surmounted; if the force of the winds and the waves be such as to mock at the work of the architect and the skill and strength of the mariner, the loss properly falls on the insurers, who are paid for assuming the risk.

It is a common error to suppose that destruction by heavy gales is the only imminent danger to which seaworthy ships are exposed in the open seas. It was shown on the trial, by the testimony of skillful and experienced commanders, that the rolling of a ship laden with grain, in a heavy sea, with a light wind, has a more straining effect, and is attended with greater peril, than a severe and continued gale. Neither the winds nor the waves are governed by landsmen's rules.

It is manifest from the evidence, that the Senator, on her last voyage, was exposed to more than the ordinary perils of a passage from New York to Liverpool, and that the difficulties she encountered were such as might well disable a seaworthy ship. She was heavily laden with a cargo consisting mainly of grain in bulk and in bags. She left port on the 22d of August, at the heel of a severe easterly gale. It was then raining, and she soon encountered a heavy easterly sea. There was a strong breeze, which continued until the next day, when it veered round from the east and blew heavily from the northwest. During the 23d, the wind shifted to various points of the compass, and there was a succession of squalls; one of them from the northwest proving very severe. The ship labored heavily, and was hauled up to the northeast on account of the force of the sea. On the 24th, the wind was still more variable, the ship laboring from the straining effects of a violent cross sea. On the

25th, there was a heavy swell, but the wind abated. The crew being exhausted, and the pumps clogged with grain, the vessel was headed for St. Johns, and went down the following morning at a distance of a hundred and twenty miles from land.

The ship before leaving port had been lying up for several weeks unladen, at the hottest season of the year; and there was, of course, at the commencement of the voyage, the leakage usual under circumstances like these with vessels thoroughly seaworthy. On the 23d, the leakage increased, and one of the pumps was kept in motion a considerable portion of the time. On the 24th the vessel made water rapidly. Both pumps were kept in motion, and an unavailing attempt was made to trace the source of the leakage. On the 25th, the pumps were so clogged with grain, that there was no longer a prospect of clearing the hold of water, and the only resource was to make for the nearest port. The mere statement of these facts shows an adequate cause to explain the loss of the vessel. The precise perils encountered were those intended to be covered by the policy.

It is claimed, however, by the defendants, that these facts were not only insufficient to account for the loss, but were such as to raise a conclusive legal presumption that the ship was unseaworthy at the commencement of the voyage. There is a class of cases in which a presumption of this kind arises; but the defendants are in error in assuming that, even in those cases, it is in the nature of a *presumptio juris et de jure.* It is a mere presumption of fact, which shifts the *onus probandi,* and prevails only where it is unrepelled by countervailing proof. But even to this extent, no presumption of unseaworthiness arises, except from facts which exclude the rational inference of a loss attributable to the perils of the seas.

Where the inability of a ship to perform its voyage becomes evident soon after leaving port, and it founders without stress of weather or other adequate cause of injury, the presumption is that this inability existed before setting sail, and that it is due to some latent defect which rendered

the vessel unseaworthy. (*Talcott* v. *Commercial Ins. Co.*, 2 Johns., 123 ; *Barnwell* v. *Church*, 1 Caines, 217 ; *Paddock* v. *Franklin Ins. Co.*, 11 Pick., 227, 237 ; *Watson* v. *Clarke*, 1 Dow's Parl. R., 336.)   The reason of this rule is stated by the court in the case of *Patrick* v. *Hallett*.   "The law will intend a want of unseaworthiness, because no visible or rational cause, other than a latent or inherent defect in the vessel, can be assigned for the loss." (3 Johns. Cas., 76.)

But where it satisfactorily appears that the vessel was sea-worthy on leaving port, and that it encountered marine perils which might well disable a staunch and well manned ship, no such presumption can be invoked for the purpose of over-turning a verdict and absolving the insurers from liability. (1 Marshall on Ins., 158, 159 ; 1 Arnould on Ins., 662, § 245 ; *Sherwood* v. *Ruggles*, 2 Sandf., 55 ; *Patrick* v. *Hallett*, 1 Johns., 241 ; 3 Johns. Cas., 76 ; *Miller* v. *Russell*, 1 Bay, 309 ; *Parker* v. *Potts*, 3 Dow's Parl. R., 23 ; *Smith* v. *Bis-sett*, 15 Decisions of Scotch Court of Sessions ; *Burgess* v. *Wickham*, 10 London Jurist, N. S., 92.)

The proof is clear, in the present case, that the Senator, at the inception of the risk, was seaworthy.   Her qualities had been thoroughly tested by fifteen years of ocean service, and during that period every cargo with which she had been laden, so far as the case discloses, had been delivered in good condition at the port of destination.   She was built of white oak, by skillful naval architects, and was known as one of the best ships that sailed from the port of New York.   She was a thorough sea boat, and had rarely met even with the slight and ordinary casualties incident to the merchant ser-vice.   In all cases where these occurred, she was at once thoroughly repaired.   An accident of no very serious char-acter occurred to her in the early part of 1860, which gave occasion for the insertion of tree nails and bolts, and on boring the hull thoroughly up to the water line, she was found to be perfectly sound.   The testimony of the ship-wright who put in additional kelsons, shows that she was as staunch and strong as when she came from the hands of the builders.   The correctness of his judgment was verified by

the success of her subsequent voyages, in several of which she encountered severe weather and heavy seas. She was again examined in 1862, at Liverpool as well as New York, on the occasions of making ordinary repairs, shortly before her last clearance, and was in each instance found to be in good condition and thoroughly sound. She arrived at New York in July, on her last voyage from Liverpool, with a cargo of nine hundred tons of salt in bulk, and it was delivered dry and in good condition, though the weather had been rough on the passage. She had been examined in 1860, and again in 1862, by the inspector of the defendant's company, himself an experienced navigator, and he testified on the trial that he found her seaworthy. She was laden for her last voyage under the immediate direction of the surveyor of the board of underwriters, of which the defendants were members, and when she left port she was well manned and equipped for the seas.

Facts such as these, established by the testimony of disinterested witnesses, former owners and masters, experienced shipwrights and navigators, and officers employed by the insurance companies, leave no room for doubt that the Senator was seaworthy at the inception of the risk.

It was suggested on the argument that there was evidence tending to show that the master misjudged in not earlier abandoning the voyage and returning to port. As no such question was raised, either on the motion for nonsuit, or the application for instructions to the jury, it is not properly before us for consideration.

There was no error in refusing to instruct the jury that if the Senator commenced leaking with ordinary weather and seas, without the intervention of extraordinary peril, the presumption of law is that this leak arose from some defect, rendering the vessel unseaworthy at the commencement of the voyage. Such an instruction would have been plainly erroneous as applied to the trifling leakage which in this instance appeared on leaving port; as the fact was proved and undisputed, that this is an ordinary occurrence with seaworthy ships under similar circumstances; and it is quite

apparent that in the present case it was not the cause of disaster. But the proposition, in its broad terms, is neither sound in law nor applicable to the facts disclosed by the evidence.

It is claimed that the judge erred in permitting the pleadings to be amended in conformity with the facts proved. The plaintiff was the party insured, and he took the policy *on account of whom it might concern.* In the original complaint, he alleged that he was the owner of the ship, and interested therein to an amount exceeding the sum insured, and this was put in issue by a negative pregnant in the answer. On the trial he was permitted, without objection, to prove the precise character of the ownership, and it appeared that his own interest was nine-sixteenths, and that of the other party concerned in the policy, seven-sixteenths of the subject of insurance. At the close of the plaintiff's evidence the defendant moved for a nonsuit. The motion was not founded on any variance between the allegations made in the complaint and the evidence given on the trial, but on other specific grounds which the court held to be untenable. An amendment in this respect was therefore superfluous, but the plaintiff thought proper to ask it, and he was permitted to modify his allegations in conformity with the facts. There was no complaint that the defendant had been misled. (Code, §§ 169, 170.)

The amendment did not change the character of the action; and this was the only objection suggested to its allowance. It was granted in furtherance of justice, and in the exercise of a discretion which it is not our province to review. (*Hodges* v. *Tennessee Ins. Co.,* 4 Seld., 417, 418; *Bank of Havanna* v. *Magee,* 20 N. Y., 355; *Lounsbury* v. *Purdy,* 18 N. Y., 515.)

It is claimed that the plaintiff should have been nonsuited, for the reason that the preliminary proofs failed to show the transfer to Frances M. Walsh of the fractional interest which belonged to Albert E. Walsh at the time the ship was registered; and it is now insisted that to this extent, the defendant could only be held liable in an action brought after the lapse of thirty days from service of proof of her interest as *cestui que trust.*

Even if this objection had been specifically taken on the motion to dismiss the complaint, as the appellant seems to assume, it could not properly have been sustained. It had relation merely to the extent of the recovery, and not to the plaintiff's right to maintain the action, for such damages as upon the proofs and allegations he was entitled to claim in respect to his own interest. He had insured the vessel on account of whom it might concern; and it was found, as matter of fact, that the policy was intended to cover the interest of the other owner, as well as that of the assured. On a policy in this form, the plaintiff could sue in his own name for the benefit of both. (2 Duer on Ins., §§ 6, 9 ; *Jefferson Ins. Co.* v. *Cotheal,* 7 Wend., 82; *Burrows* v. *Turner,* 24 Wend., 276.) This right is confirmed by the Code, which authorizes an action by "a person with whom or in whose name a contract is made for the benefit of another," who is to be deemed for that purpose the trustee of an express trust. (Code, § 113.) The fact was undisputed, that the assured was the owner of nine-sixteenths of the vessel in his own right. His interest, at all events, was embraced in the policy; and preliminary proof of such interest, and of its precise extent, had been duly made to the company. In respect to that interest, he was plainly entitled to a verdict, unless there were other grounds for defeating a recovery. It would have been clearly erroneous to dismiss the complaint on a ground applicable only to the interest he represented as trustee for Mrs. Walsh. It is not claimed that the question was raised at any other stage of the trial, and it is not therefore properly before us for review.

But the objection now urged was not specifically taken, even on the motion for a nonsuit. An exception during the progress of a trial is unavailing, unless it be to the decision of some definite question of law, properly brought to the notice of the court. It is not enough that a point, presented in a distinct form for the first time in an appellate tribunal, can be shown to be within the scope of vague and general objections taken on the trial. To make the exception available, it must appear that the precise question intended to be

raised was brought to the attention of the court, unless it be of a nature so obvious as to require no specification. That the objection now urged was not of that character, is quite apparent. It does not seem to have occurred even to the appellant, when he framed the instructions which the court was requested to submit to the jury. The propositions presented in support of the motion for a nonsuit, not only did not point to the particular defect now suggested in relation to the separate interest of Mrs. Walsh, but tended to convey the impression that each of the objections made was applicable to the entire claim.

But if the question had been presented in such a form as to authorize us to consider it on appeal, we should have no difficulty in reaching the same conclusion. Assuming the fact to be, as the jury have found it, that the insurance was effected by the plaintiff for the benefit of the owners, of whom he was one, and that this was the mutual intention of all the parties concerned, we think the omission, in furnishing the preliminary proofs, to present evidence of the transfer to Mrs. Walsh of the interest previously held by her brother-in-law, did not invalidate the claim of the plaintiff under the policy, as her trustee. The obvious purpose of the clause providing for preliminary proof of loss and interest, was to secure to the underwriters, on the presentation of a claim, a reasonable assurance that they were liable for the loss, and that the claimant was entitled to receive the stipulated indemnity. The transfer to Mrs. Walsh of the interest, in respect to which the plaintiff was a mere trustee, in no manner affected their liability for the loss, or his right to the money, as between him and the company. Its only effect was to make him accountable to her as his *cestui que trust*. The payment of the amount to him would have been a perfect protection to the underwriters. Technically, they might have objected to the ship's register as preliminary proof of his interest under the policy; for it did not purport to show who were the owners at the time of the loss, but only who were such at a period anterior to the insurance. They might have required proof, by affidavit or otherwise, of the existing

interests in the vessel at the time of the loss; but this they did not choose to exact, and, having waived it then, it was too late afterwards to raise the objection. The courts have uniformly held that, in policies of this description, the clause providing for preliminary proofs is to be expounded liberally in favor of the assured; that it is to be limited in its office to the purpose for which, by common understanding, it is inserted; and that it is satisfied by furnishing such reasonable evidence as the party can command at the time, to give assurance to the underwriters of his right to receive the money, and of their liability for the loss. (*Talcott* v. *Marine Ins. Co.*, 2 Johns., 136; *Barker* v. *Phœnix Ins. Co.*, 8 id., 318; *Lawrence* v. *Ocean Ins. Co.*, 11 id., 136; *Child* v. *Sun Ins. Co.*, 3 Sandf., 41.)

It was strenuously insisted on the argument that the policy was not *intended* by the plaintiff to embrace the interest of the other owner, and that it should, therefore, be limited in its operation to his own share of the vessel. The terms of the policy, so far as they are set forth in the case and stated in the stipulation, plainly import an insurance of the entire interest. The presumption deducible from the face of the instrument is strengthened in view of the fact that there was but a single owner besides himself; and the provision that though the insurance was on account of whom it might concern, the loss, if any, should be payable to him or his order, indicates strongly his purpose to protect the entire interest. The jury found, as matter of fact, that it was so intended; and as no question of law was raised in regard to it at any stage of the trial, the point is one we are not at liberty to consider.

It is also claimed that the court erred in admitting the testimony of experienced navigators, as to the effect produced upon a ship laden like the Senator, by rolling in heavy seas and meeting the perils which she is proved to have encountered. It is conceded that the testimony of shipwrights was admissible, but it is contended that nautical men were incompetent to testify on questions of this nature. We entertain no doubt that those who are accustomed to the responsibilities

of command, and whose lives are spent on the ocean, are qualified as experts to prove the practical effect of cross seas and heavy swells, shifting winds and sudden squalls. If the testimony of the plaintiffs' witnesses was true, this was the nature of the perils which proved fatal to the Senator, after she had rode out in safety every Atlantic gale encountered in a service of fifteen years. On questions of this description navigators have uniformly been regarded as experts. (2 Duer on Insurance, p. 683, sec. 27; *Fenwick* v. *Bell*, 1 Carr. & Kirwan, 312; *Malton* v. *Nesbitt*, 1 Carr. & Payne, 70; *Ogden* v. *Parsons*, 23 How. U. S., 167; *Price* v. *Powell*, 3 Comst., 323, 326.) But even if this were otherwise, it would not aid the appellants, as the question was not seasonably raised. The only objection specified when the proof was offered was that it was immaterial, and this was properly overruled.

The motion to strike out the testimony of a large number of the witnesses on this subject, was made on the sole ground that their evidence was predicated on facts not proved. This assumption was inaccurate; but if it were otherwise, the objection was waived when the proof was introduced, and this waiver could not afterwards be revoked.

The master of the vessel, in the course of his examination, after detailing the particulars of the disaster, was asked to what the loss was attributable. It is now claimed that this was inadmissible, because it was allowing the witness to testify to the very question the jury was to determine. If this was a sufficient ground of objection, it was waived by omitting to present it on the trial. But the evidence was plainly admissible. The witness was testifying to matters within his personal knowledge, and was just as competent to prove a fact directly in issue as one only incidentally involved. (*Jameson* v. *Drinkald*, 12 Moore, 157.)

The judgment of the Superior Court should be affirmed, with costs.

DAVIS, J., also read an opinion for affirmance.

All the judges concurring; the judgment was affirmed, with costs.