## GILLESPIE v. COLLIER.†

(Circuit Court of Appeals, Eighth Circuit. May 10, 1915.)

No. 4309.

1. INFANTS ⬤⟼78—ACTIONS BY—APPOINTMENT OF NEXT FRIEND—STATUTE.
   Under Rev. Laws Okl. 1910, § 4686, providing that an action by an infant must be brought by his guardian or next friend, and authorizing the court to dismiss an action brought by the next friend, if it is not for the benefit of the infant, or to substitute a guardian of the infant, or any other person, as next friend, an order appointing a next friend is not a prerequisite to the right to sue, but the court's power is subsequent and supervisory.
   [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 195–207, 209; Dec. Dig. ⬤⟼78.]

2. INFANTS ⬤⟼80—ACTIONS BY—APPOINTMENT OF NEXT FRIEND—CURE OF OMISSION.
   Where the judgment for an infant plaintiff recited that the action of the next friend in suing was ratified and approved by the court, the omission to appoint the next friend, when such appointment was necessary, was cured, since the matter is not jurisdictional.
   [Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 210–221; Dec. Dig. ⬤⟼80.]

3. RELEASE ⬤⟼17—VALIDITY—FRAUD.
   Where the master paid an injured servant his regular wages for several months after the accident, and in giving him the last check therefor requested him to sign a receipt to show at the office that the amount had

---

been paid, which the servant did without reading the receipt, the servant is not bound by a provision therein releasing all claims for damages against the master, especially where the release was not pleaded as a defense.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 32; Dec. Dig. ☞17.]

4. APPEAL AND ERROR ☞1051—HARMLESS ERROR—ADMISSION OF EVIDENCE—FACT OTHERWISE ESTABLISHED.

The admission of evidence of an examination of a defective throttle on the engine, which plaintiff was operating when injured, made more than a month after the accident, without proof that the condition was the same then as at the time of the accident, was harmless, where the other evidence clearly showed that the throttle leaked at the time of the accident, and that complaint had been made thereof on that ground.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161-4170; Dec. Dig. ☞1051.]

5. APPEAL AND ERROR ☞970—EVIDENCE ☞546—REVIEW—DISCRETION OF TRIAL COURT—EXPERT TESTIMONY.

In cases where it is doubtful whether the opinion of experts will be helpful in determining the ultimate fact, the admission or rejection of such evidence rests largely in the trial court's discretion, and will not be reviewed, unless manifestly erroneous.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3849-3851; Dec. Dig. ☞970; Evidence, Cent. Dig. § 2363; Dec. Dig. ☞546.]

6. MASTER AND SERVANT ☞270—IMMATERIAL ISSUE.

Where plaintiff was injured in trying to start a well-pumping engine, after he had oiled it, because the throttle allowed steam to leak into the cylinder, so that when he moved the engine from dead center it started suddenly, it was not error to exclude answers by defendant's witnesses to questions whether the engine was reasonably safe and suitable for pumping.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913-927, 932; Dec. Dig. ☞270.]

Sanborn, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Oklahoma; Frank A. Youmans, Judge.

Action by Steven Collier, a minor, by his next friend, Louis Collier, against E. N. Gillespie. Judgment for plaintiff, and defendant brings error. Affirmed.

W. A. Sipe, Jr., of Tulsa, Okl. (George E. Black, of Tulsa, Okl., on the brief), for plaintiff in error.

J. P. O'Meara, of Tulsa, Okl. (R. S. Sherman and James A. Veasey, both of Tulsa, Okl., and B. A. Lewis, of Dewey, Okl., on the brief), for defendant in error.

Before SANBORN, HOOK, and CARLAND, Circuit Judges.

HOOK, Circuit Judge. Steven Collier, a minor, suing by his next friend, recovered a judgment for personal injuries sustained in the service of E. N. Gillespie, who with others was engaged in the oil and natural gas business. The plaintiff had been a roustabout on the work, and was put in charge of a drilling machine, with boiler and engine. The negligence charged was that the engine was old and defective, in that the parts of the throttle were so worn that steam leaked into the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cylinder, though the only mechanical means had been used for shutting it off, and that he had not been instructed and was ignorant of the danger. On the occasion of the accident he had shut off the steam, as he supposed, and stopped the engine, and oiled it. The engine had stopped on a dead center, and while he was in the act of moving the flywheel, with a stick as a lever, one end between the spokes and the other under his arm, the steam which had leaked into the cylinder caused the wheel to revolve suddenly and violently. He was thrown upward and into the machinery, and severely injured.

[1, 2] It is urged by defendant that the action should have been dismissed, because there was no order of the court appointing the next friend of the plaintiff. But the Oklahoma civil procedure (section 4686, Rev. Laws 1910) applicable to cases like this does not require such an order. It provides that the action of an infant must be brought by his guardian or next friend, and confers power upon the court to dismiss it when brought by the next friend, "if it is not for the benefit of the infant, or substitute the guardian of the infant, or any person as the next friend." The plain implication from this provision is that the initiative in the selection of the next friend is not with the court, and that its power is subsequent and supervisory, in the interest of the minor. This is also the rule in Kansas, whence the Oklahoma statute was taken. See Abbott v. Abbott, 68 Kan. 824, 75 Pac. 1041. It may be further observed that the judgment recites that "the action of Louis Collier in suing as next friend of Steven Collier is by the court ratified and approved." Even though the court itself should have appointed the next friend, this approval in the judgment would cure the omission. See Hill v. Reed, 23 Okl. 616, 103 Pac. 855. The matter is not jurisdictional.

[3] Complaint is made of an instruction that plaintiff was not bound by a release of damages. The answer alleged that in consideration of certain payments made him plaintiff had acknowledged full satisfaction for his injuries, and had released and discharged the defendant from liability; also that plaintiff had not repaid or offered to repay the money. The evidence, which was uncontradicted, showed that plaintiff continued to receive his wages for about eight months after the accident, that when a representative of defendant gave him a check for the last monthly wage he requested him to sign a receipt "to show the office he paid the amount," that nothing was said about settling a claim for damages, and that plaintiff signed the paper without reading it. It contained the words "as payment in full for all damages." The receipt was not set up in the answer, nor was it even averred that plaintiff had given a written release or discharge of his claim. We think the instruction was right under the circumstances, regardless of the particular reason assigned by the court.

[4] A witness for the plaintiff was allowed to testify, over objection, to the defective condition of the throttle, as disclosed by an examination about 35 days after the accident. Some time after the accident, but just how long does not appear, the engine was put out of use, and was not again employed before the witness took the throttle off and inspected it. The rule is that, upon an issue as to the condition of

machinery or appliances at the time of an injury, evidence of a defective condition at a later time is inadmissible, without proof from which a reasonable inference may be drawn that there has been no substantial change. But the other evidence in the case showed so clearly the throttle was defective and leaked steam, and complaint of it had been made on that ground, that we think no prejudice resulted from the testimony of the witness. The examination of the throttle was made by the witness to verify what he thought was the cause of the leakage he noticed before the accident.

[5] Complaint is also made because the court sustained objections to questions calling for the opinions of witnesses as to whether the machine was "reasonably safe and suitable for pumping," whether "a little leak in the throttle would render the machine unsafe or unsuitable or dangerous to pump with," also what its condition was as to safety and suitability "for pumping or otherwise." The opinions of those who are learned or experienced in questions of science, skill, or trade, which are not within the understanding of men in general, are admissible in evidence, when helpful to the decision of the ultimate fact. But so various are the subjects and so frequently does the common understanding in the communities from which juries are drawn depend upon local conditions that no hard and fast line can safely be drawn, particularly by an appellate court. "Cases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." Spring Co. v. Edgar, 99 U. S. 645, 658 (25 L. Ed. 487). In Gila Valley R. Co. v. Lyon, 203 U. S. 465, 27 Sup. Ct. 145, 51 L. Ed. 276, upon an issue whether a railroad company had performed its duty respecting the safety of a working place, witnesses were allowed to give their opinions that a buffer at the end of a track was unsafe, and that an overhead structure was too near the tops of cars. The Supreme Court said:

"In the cases of all the witnesses, we think the question of the admissibility of their evidence was one within the reasonable discretion of the trial court, and that the discretion was not abused. All the witnesses had had practical experience on railroads, and were familiar with structures and the character of buffers mentioned in the evidence. There was certainly enough to call upon the court to decide upon the admissibility of their opinions under these circumstances, and we ought not to interfere with the decision of the trial court in this case."

[6] That there are cases in which a trial court has a certain discretion in receiving or rejecting expert or opinion evidence was also recognized by this court in United States Smelting Co. v. Parry, 92 C. C. A. 159, 166 Fed. 407. This rule, however, is not really involved in the case at bar. The issue was not whether the engine was safe or dangerous to pump with. The engine was not at work when the plaintiff was injured. It had been shut down to be oiled, and was supposed to be at rest, and while truly in that condition the manual movement of the flywheel to throw the piston and crank out of alignment would manifestly not have been dangerous. A considerable leakage of steam might have impaired the efficiency or suitability of the engine for pumping, but without danger to the workman in his proper position

while pumping was going on. On the other hand, with the steam shut off and the engine believed to be fixed at rest, an unexpected movement might have been dangerous to a man at work about it as the plaintiff was. The questions asked the witness did not direct attention to the particular work at which the plaintiff was engaged at the time, and the court therefore properly excluded them. Moreover, one of the witnesses had already testified he had not observed the engine leaking steam, had never had occasion to shut it down, and had no reason to find out whether it leaked or not. The other witness of whom the remaining questions were asked had already substantially answered them. There is nothing else of moment in the case.

The judgment is affirmed.

SANBORN, Circuit Judge (dissenting). It is conceded that, upon an issue as to the condition of machinery and appliances at the time of an injury, evidence of a defective condition at a later time is inadmissible, in the absence of proof from which a reasonable inference may be drawn that there has been no substantial change. When the witness Ewing testified, over the objection and exception of the defendant, that 35 or 36 days after the accident he took the throttle of the engine out of its seat, found a flat place where it did not fit, and that it was leaking steam exceedingly, there had been no evidence introduced into the case from which an inference could lawfully be drawn that the throttle and the engine were in the same condition at that time that they were when the accident occurred. Moreover, the testimony taken subsequent to the admission of this evidence conclusively demonstrated that the throttle and the engine had been used after the accident, and therefore that they could not have been in the same condition 35 days thereafter that they were in at the time of the accident. The witness Hesher testified that he worked on the machine pumping with it about 4 hours immediately after the accident, and four or five shifts thereafter. It seems to me, therefore, that it was a fatal error to receive this testimony of the witness Ewing.

In the opinion of the majority, however, it is said that they think no prejudice resulted from this testimony, because the other evidence in the case proved so clearly that the throttle was defective and leaked steam, and because complaint had been made of that fact to a superior officer before the accident. The legal presumption, however, is that error produces prejudice. It is only when the fact appears beyond doubt that an error challenged, not only did not, but also could not, have prejudiced the complaining party, that the rule that error without prejudice is no ground for reversal can have effect. Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; Mexia v. Oliver, 148 U. S. 664, 673, 13 Sup. Ct. 754, 37 L. Ed. 602; Railroad Co. v. O'Reilly, 158 U. S. 334, 337, 15 Sup. Ct. 830, 39 L. Ed. 1006; Peck v. Heurich, 167 U. S. 624, 629, 17 Sup. Ct. 927, 42 L. Ed. 302; Crawford v. United States, 212 U. S. 183, 203, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392; Choctaw, O. & G. R. Co. v. Holloway, 114 Fed. 458, 465, 52 C. C. A. 260; United States v. Gentry, 119 Fed. 70, 75, 55 C. C. A. 658, 663; Union Pacific R. Co. v. Field, 137 Fed. 14, 18, 69 C. C. A. 536, 540;

Armour & Co. v. Russell, 144 Fed. 614, 616, 75 C. C. A. 416, 418, 6 L. R. A. (N. S.) 602; United States v. Ute Coal & Coke Co., 158 Fed. 20, 29, 85 C. C. A. 302, 311; Mutual Reserve Life Ins. Co. v. Heidel, 161 Fed. 535, 539, 88 C. C. A. 477, 481; Alaska-Treadwell Gold Min. Co. v. Cheney, 162 Fed. 593, 600, 89 C. C. A. 351, 358; Norfolk & P. Traction Co. v. Miller, 174 Fed. 607, 611, 98 C. C. A. 453, 457; Stewart v. Brune, 179 Fed. 350, 353, 102 C. C. A. 534, 537; Pettine v. Territory of New Mexico, 201 Fed. 489, 492, 119 C. C. A. 581, 584.

This was an action for negligence. The crucial question was whether or not before the accident the throttle of the engine of the No. 7 Star drilling machine which Collier was using leaked so much steam that the leakage disclosed the fact that the engine was so out of repair that it was negligence for the defendant below to permit its use. The legal presumption was that it did not so leak, and that the defendant was not negligent, but that it exercised reasonable care in providing the machine, keeping it in repair, and permitting its use. All the evidence on the subject of the leakage of steam before the accident is embodied in the following testimony: Duffey testified that he had operated other engines of this type, that when they are in good condition they do not leak steam, that this engine leaked steam before the accident, and he asked Bill Gillespie to get a new one. Ewing testified that the engine leaked steam, that he knew this because, after the engine had been standing, the steam would crawl and creep and fill up, but that he did not notice the leaking so much until after Mr. Duffey had made a fuss about it a few mornings before the accident. Biddle testified that the throttle leaked a little steam, which was caused by its working loose and the steam cutting out a little more; that he had pulled rods with the engine a couple of times and had no trouble with it. Jackson testified that for 14 or 15 years he had been the representative of the Star drilling machines, that as a rule the throttles on all such machines leaked, and that if this means that they are out of repair then all are out of repair, the new as well as the old, and that he did not believe he ever saw one that did not leak some steam. Hartman testified that he had had three years' experience in the actual operation of Star drilling machines, that while Collier was pumping with this machine he and Collier used it in pulling rods at various times, that they took turns about at wrenching the rods and at operating the machine; that he could not say whether the throttle leaked any steam, but that he knew that it did not leak enough to be noticeable, or to amount to anything, and that if it had it could not have been used for pulling rods, because, as the rod goes down, it must be shut off altogether, or it cannot be operated—that is, if it leaks enough to amount to anything. Hesher testified that he had been following the oil business as pumper, tool dresser, and roustabout 15 years, that he had operated Star drilling machines 2 or 3 years, that he worked on the machine on which the plaintiff was hurt pumping with it about 4 hours after the accident and for four or five shifts after that, that he had no trouble operating it, that just before the accident it had been used for cleaning out a well, that he never observed it leaking steam, that he had no reason to find out whether it did or not, never having had occasion to shut it down to

fix anything, that he worked right along with it pumping the well and never had the least bit of trouble with it.

The foregoing is all the testimony on this subject, and reduced to its lowest terms it is by one witness, Duffey, that machines of this character do not leak steam when in good condition, and by another witness, Jackson, that all of them, new as well as old, leak some steam; by two witnesses, Duffey and Ewing, that the engine leaked so much steam that Duffey asked Gillespie to get a new one; by another witness, Hartman, that he worked on it with Collier just before the accident and knew it did not leak enough to be noticeable, or to amount to anything, because if it had it could not have been used for pulling rods; by another witness, Biddle, that it leaked a little steam but he pulled rods with it a couple of times and had no trouble with it; and by still another witness, Hesher, that he worked right along with it, pumping the well, never observed it leaking steam, and never had a bit of trouble with it. This evidence is very far from convincing my mind beyond doubt that the admission of the incompetent testimony of Ewing that 35 or 36 days after the accident he took the throttle out of the engine, found a flat place where it did not fit, and that it was then leaking exceedingly, did not prejudice, and could not have prejudiced, the defendant. On the other hand, it leads me to believe that it must have prejudiced, and did prejudice, the defendant.

Nor am I persuaded that it was within the discretion of the court below to reject the proposed answer of the witness Hesher to the question, "From your experience with this machine, would you consider it reasonably safe for pumping?" It seems to me to be altogether too narrow and technical an interpretation of the word "pumping" and of this question to say that they did not refer to and include the movement of crank and piston by the prying of the flywheel from a stationary to a moving condition after the machine had been for some time at rest. When this question was asked, evidence had been introduced which established these facts: "Just before the accident," Biddle "had been pumping with the machine." "Just before the accident" Collier "shut off the steam and oiled the engine, which was on center." Then he took his forgy stick and pried the flywheel into motion for the purpose of continuing the pumping. The issue on trial was whether or not the machine was dangerous to Collier at the time he pried the wheel to continue the pumping, and that fact was unavoidably in the minds of court, counsel, and witness when the question was propounded. Not only this, but Hesher had just testified that he had been working right along with the machine, that it "would sometimes stop on center, which necessarily happens at times in the case of any machinery and with Star drilling machines in the best of repair. By the engine getting on center is meant, when the piston rod and crank stand straight up and down with the cylinder and in the same straight line, so that the steam cannot get a purchase, and to get it off it has to be pried or pulled one way or the other before it will take steam. My method of getting it off was to shut off the steam, take hold of the balance wheel, and push or pull it whichever way I wanted it to take steam."

Such was the question at issue, and thus had the witness Hesher related his experience when he was asked, "From your experience with this machine would you consider it reasonably safe and suitable for pumping?" It seems to me that the question was clearly intended to ask, and did ask, the opinion of the witness as to the safety of the machine for the starting of it by the prying of the flywheel after it had been at rest, in order to continue the pumping it had been doing before it was stopped, as well as for the mere movement of crank and piston, while it was actually drawing the oil from the well, and I believe that court, counsel, and witness so understood it. In my opinion they could not have understood it otherwise, because there was no question of the safety of the machine while the crank and piston were actually drawing oil from the well, and the only question in controversy was as to its safety during the process of prying the flywheel into motion.

For the same reasons it seems to me that the question, "What was its condition with reference to whether it was safe and suitable for pumping or otherwise?" had the same meaning and was asked and understood by all of the parties in the same way. These questions and the question to Hartman, "Would you consider a little leak in the throttle would render the machine unsafe or unsuitable to pump with?" were asked, not only of witnesses who had been engaged in using machines of this character for years, but of two witnesses who had actually operated the machine on which Collier was injured just before his accident. It seems to me that if there ever was a case in which a litigant had the right to introduce the testimony of expert witnesses possessed of special knowledge, training, and experience relative to the crucial issue in the case which jurors of ordinary knowledge, observation, and experience could not have, this was that case, and that to hold that it was in the discretion of the trial court to reject the testimony of these witnesses is in effect to abrogate the rule that expert testimony is admissible, and to leave it within the discretion of the court to reject the evidence of all expert witnesses.

The authorities cited by the majority do not sustain the position that it is discretionary with the trial court to refuse to admit clearly competent expert testimony. They go no farther than to hold that the trial courts committed no error and did not exceed the limited and reasonable discretion they have to determine whether or not the witnesses offered are qualified as experts and whether or not their testimony is admissible under the established rule. This is an entirely different thing from holding that it is discretionary with the trial courts to reject the most competent expert testimony, and none could be more competent, as it seems to me, than that here offered. Thus in Spring Co. v. Edgar, 99 U. S. 645, 658, 25 L. Ed. 487, the testimony of experts on the question whether or not a male deer was dangerous at certain seasons of the year was admitted; in Gila Valley R. R. Co. v. Lyon, 203 U. S. 465, 27 Sup. Ct. 145, 51 L. Ed. 276, the testimony of experts on the question whether or not a railroad track on a trestle with a buffer at the end of it were reasonably safe for the operation of an engine and cars thereon was admitted in evidence; and in United

224 F.—20

States Smelting Co. v. Parry, 166 Fed. 407, 92 C. C. A. 159, the testimony of a practical builder that a scaffold was not reasonably safe for use by workmen, was received. It is true that the appellate courts in the opinions in these cases remarked that the trial courts have a reasonable discretion in determining the admissibilty of expert testimony, and that in admitting the testimony described in these cases they did not exceed or abuse that discretion. But that is very far from holding that it would not have been an abuse of that discretion to have rejected this evidence. I take it that the meaning of the statements regarding the discretion of the trial courts in these opinions is that where the testimony offered is on the verge of inadmissibility the trial courts have a limited and reasonable discretion in determining its admissibility.

No authority has been cited to the effect, and I am unable to persuade myself, that a trial court has the discretion to reject the testimony of experts which is clearly competent under the well-established rule upon the subject. Such a discretion would not be a reasonable, but an unreasonable, discretion, and the exercise of it would abolish the rule. In the case last cited Judge Van Devanter, now Mr. Justice Van Devanter of the Supreme Court, delivered the opinion of this court after a thorough and exhaustive review of the authorities. After stating the general rule that witnesses are permitted to testify to the primary facts within their knowledge, but not to their opinions, he said:

"The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion when it will tend to aid the jury in reaching a correct conclusion; the true test being, not the total dependence of the jury upon such testimony, but their inability to judge for themselves as well as is the witness. A reference to adjudicated cases will show the extent of this qualification, its application in actual practice, and the discretion accorded to the trial judge in that regard. In Transportation Line v. Hope, 95 U. S. 297 [24 L. Ed. 477], there was called in question a ruling of the Circuit Court whereby a witness of large experience in towing vessels was permitted to testify that in his opinion it was not safe or prudent for a tugboat in Chesapeake Bay to tow three boats abreast, with a high wind; that being the point to be decided by the jury. The ruling was sustained; it being said in that connection: 'The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert as such is expected to testify. Evidence of this character is often given upon subjects requiring medical knowledge and science, but it is by no means limited to that class of cases. It is competent upon the question of the value of land (Clark v. Baird, 9 N. Y. 183; Bearss v. Copley, 10 N. Y. 93); or as to the value of a particular breed of horses (Harris v. Panama Railroad Co., 36 N. Y. Super. Ct. 373); or upon the value of the professional services of a lawyer (Jackson v. New York Central Railroad Co., 2 Thomp. & C. [N. Y.] 653); or on the question of negligence in moving a vessel (Moore v. Westervelt, 9 Bosw. [N. Y.] 558); or on the necessity of a jettison (Price v. Hartshorn, 44 N. Y. 94, 4 Am. Rep. 645). In Walsh v. Washington Marine Insurance Co., 32 N. Y. 427, it was decided that

the testimony of experienced navigators on questions involving nautical skill was admissible. The witness in that case was asked to what cause the loss of the vessel was attributable, which was the point to be decided by the jury. The court sustained the admission of the evidence, using this language: "We entertain no doubt that those who are accustomed to the responsibility of command, and whose lives are spent on the ocean, are qualified as experts to prove the practical effect of cross-seas and heavy swells, shifting winds, and sudden squalls." The books give a great variety of cases in which evidence of this character is admissible, and we have no doubt of the competency of the evidence to which this objection is made.'"

Justice Van Devanter then proceeded to review Spring Co. v. Edgar, 99 U. S. 645, 25 L. Ed. 487, which has already been reviewed here, Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U. S. 612, 4 Sup. Ct. 533, 28 L. Ed. 536, in which the admission of the testimony of nonprofessional witnesses based on their observations of his conduct to the mental condition of the insured, was affirmed; Union Ins. Co. v. Smith, 124 U. S. 405, 8 Sup. Ct. 534, 31 L. Ed. 497, wherein the admission of the testimony of experienced seamen relative to the good seamanship and prudence of towing a disabled vessel out of a port of repair and safety across Lake Erie, was sustained; Northern Pacific R. R. Co. v. Urlin, 158 U. S. 271, 15 Sup. Ct. 840, 39 L. Ed. 977, in which the admission of the testimony of physicians as to whether the examination of the plaintiff's person was made in a superficial or in a thorough and careful manner, was approved; Texas & Pacific Ry. Co. v. Watson, 190 U. S. 287, 23 Sup. Ct. 681, 47 L. Ed. 1057, in which the Supreme Court held that the answer of a qualified witness to the question whether or not if an engine conducted itself in a way particularly described he would say there was anything wrong with it, was properly admitted; Gila Valley R. R. Co. v. Lyon, 203 U. S. 465, 27 Sup. Ct. 145, 51 L. Ed. 276, which has been reviewed above; St. Louis, etc., Co. v. Edwards, 78 Fed. 745, 24 C. C. A. 300, wherein this court held that the testimony of an expert in handling cattle to the damage sustained by cattle from their long detention in cars, was admissible; Western Coal & Mining Co. v. Berberich, 36 C. C. A. 364, 94 Fed. 329, in which this court sustained the admission of the testimony of an experienced miner as to "whether or not that [the room in a mine] would be an ordinarily safe place to work"; Chicago Great Western Ry. Co. v. Price, 38 C. C. A. 239, 97 Fed. 423, in which this court sustained the admission of the testimony of a locomotive engineer that a rough and uneven railroad track had a tendency to jostle the pin out of a car coupling, and thus to part a train—and after citing a host of like authorities from the state courts Judge Van Devanter said that the most concise and satisfactory statement of the rule relative to the admissibility of the testimony of expert witnesses was found in Taylor v. Town of Monroe, 43 Conn. 36, 44, where the Supreme Court of Errors of Connecticut says:

"The true test of the admissibility of such testimony is not whether the subject-matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue."

The testimony rejected in this case stands the test. Years of observation and of experience in handling and operating Star drilling machines and the actual observation and operation just before the accident of the machine on which the accident occurred gave the witnesses Hesher and Hartman peculiar knowledge and experience, not common to the world, which.made their opinions on the questions asked them of especial aid and value to the court and to the jury in determining the questions at issue in this case. Under the established and generally admitted rule, under the reason of that rule, under all the authorities which have been cited, that testimony was admissible. Its rejection, in my judgment, was a clear and complete violation of the universal rule. No authority has been cited to the effect that the discretion of a trial court in the receipt of evidence of experts of doubtful admissibility extends to the rejection of the testimony of expert witnesses which is clearly admissible under the rule. All the authorities concede that the rejection of such evidence or the reception of evidence clearly inadmissible is a fatal error. The testimony rejected in this case was, in my opinion, as clearly competent and admissible as any testimony of an expert witness presented to any court, and I think its rejection was a plain and fatal error.

For these reasons it seems to me that the judgment below should be reversed, and the case should be remanded to the court below, with instructions to grant a new trial.