UNITED STATES v. UTE COAL & COKE CO. et al.

(Circuit Court of Appeals, Eighth Circuit. December 27, 1907.)

No. 2,622.

1. TROVER AND CONVERSION—ACTION FOR TRESPASS AND CONVERSION IDENTICAL WITH ACTION FOR CONVERSION WHERE NO DAMAGE TO LAND CLAIMED.

A cause of action for trespass upon land, and for the taking from it asportation and conversion of coal, timber, or other personal property, wherein the only damage alleged is the loss of the value of the personal property converted, is the same in legal effect as a cause of action for the conversion of the personal property.

2. WRIT OF ERROR—REVIEW—ERROR MUST BE PROVED.

He who alleges an error in the trial of a cause must establish it by the record or it will be disregarded.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3670.]

3. TROVER AND CONVERSION—PERSONAL PROPERTY—MEASURE OF DAMAGES.

One who unintentionally, and in the honest belief that he is lawfully exercising a right he has, enters upon the property of another, and removes his ore, his coal, his timber, or any other valuable appurtenant to his land, is liable in damages for the value of the ore, timber, or other thing in its original place, and for no more.

But one who willfully and intentionally takes ore, timber, or other property of another, and appropriates it to his own use, must respond to the owner for the full value of the property at the time he converts it, with-

out deduction for the labor bestowed or expense incurred in removing and preparing it for market.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trover and Conversion, §§ 263, 264.]

**4. SAME—PRESUMPTION OF INTENTION TO CONVERT.**

There is a legal presumption that one who takes or converts to his own use the property of another intends so to do, and a jury may lawfully infer that such a wrongdoer had knowledge of the right and title of the owner of the property which he appropriated, and that he intended to convert it to his own use from his reckless disregard of the owner's right and title, unless the presumption is overcome by evidence of his innocence and good faith.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trover and Conversion, § 215.]

**5. WRIT OF ERROR—REVIEW—PRESUMPTION OF PREJUDICE.**

The presumption is that error produces prejudice, and it is only when it is clear beyond doubt that none resulted, or could have resulted, from an erroneous ruling that the judgment may be lawfully affirmed notwithstanding.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4038–4046.]

**6. TROVER AND CONVERSION—ONE WHO DISPOSES OF PROPERTY WHICH HE KNOWS WAS WRONGFULLY TAKEN BY ANOTHER IS GUILTY OF IT.**

The wrongful taking of coal or ore from a mine, or timber from a forest, does not divest the title of the owner, and whoever obtains and disposes of it with knowledge that it was wrongfully taken is liable to the owner for its conversion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trover and Conversion, § 173.]

Philips, District Judge, dissenting.

(Syllabus by the Court.)

In Error to the District Court of the United States for the District of Colorado.

Earl M. Cranston (Ernest Knaebel and Ralph Hartzell, on the brief), for plaintiff in error.

L. F. Twitchell (Wilson & McCloskey and Frank C. Goudy, on the brief), for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

SANBORN, Circuit Judge.    In June, 1902, the United States brought this action against the Ute Coal & Coke Company, a corporation, Lewis C. Jakway, and Frank W. Stubbs, as individuals, and as copartners as Stubbs & Jakway, and Charles A. Mendenhall, Chauncey W. Howser, and Herbert J. Ross for trespass upon certain public lands, and for conversion of coal taken therefrom between January 1, 1897, and October 22, 1901.    There were two counts in the complaint, one for entering upon the land, extracting therefrom, carrying away, and converting 210,030 tons of coal of the value of $630,090, and the other for the taking and conversion of 210,030 tons of coal of the value of $630,090.    No damage to the land other than the conversion of the coal was alleged, and the proof was that both counts were for the conversion of the same coal.    One of the alleged errors in the trial is

that the court refused to submit the cause of action set forth in the first count to the jury, and confined their attention to that pleaded in the second count. But there was no error here because the two counts stated the same cause of action. The gist of the cause of action set forth in each was the conversion of the coal, and the only damage claimed in either was the loss of the value of the coal. The averment of trespass upon the land in the first count was mere inducement to the actual cause of action—the conversion—and proof of the title to the land, of the trespass, and of the taking was admissible without averments to prove the plaintiff's title to the coal and its conversion. The cause of action for trespass upon land, and for the taking from it and conversion of coal, timber, or other personal property wherein the only damage alleged is the loss of the value of the personal property converted is the same in legal effect as a cause of action for the conversion of the personal property. Stone v. United States, 167 U. S. 178, 182, 17 Sup. Ct. 778, 42 L. Ed. 127; Peyton v. Desmond, 63 C. C. A. 651, 656, 657, 129 Fed. 1, 6, 7.

The defendants the coal company, Jakway & Stubbs as individuals and as copartners, interposed three defenses: (1) A general denial; (2) that on April 5, 1897, the defendant Mendenhall filed an application in the proper land office to purchase this land under the stone and timber acts (Act June 3, 1878, 20 Stat. 89, c. 151; Act Aug. 4, 1892, 27 Stat. 348, c. 375 [U. S. Comp. St. 1901, p. 1547]); that on January 18, 1898, he made his proof and entry, and obtained his final receiver's receipt for his payment for the land, and remained in possession of it until May 31, 1901; and (3) that on May 31, 1901, Mendenhall's entry was canceled, and Blanche R. Braidon and Cyrus G. Graden applied to purchase the land as chiefly valuable for coal, and contests between them and others over the entry of it have since been pending in the Land Department of the United States. In addition to these defenses the coal company pleaded that the United States obtained a judgment against it on October 24, 1895, for $156.60 for the taking from this land and the conversion of coal between July, 1892, and February 12, 1894. Demurrers were interposed to each of these defenses except the general denial, but there is no record of any ruling upon them. It is assigned as error that the court below reinstated these defenses after demurrers had been sustained to them, but although there is an order in the record that the defenses be reinstated there is no evidence that they had been stricken down or out by any order or decision, and hence no proof of any error here. The burden is on the party who alleges an error to establish it by the record.

The plaintiff replied to these several defenses that it was true that Mendenhall applied for, purchased, and entered the land under the timber and stone acts, but that the land was chiefly valuable for coal; that he knew that fact, and made his application and entry to defraud the plaintiff out of coal land worth $20 an acre by paying $2.50 an acre for it, its price under the timber and stone acts; that the Land Department subsequently so adjudged, and for that reason canceled his entry on May 31, 1901; and that Stubbs and Jakway and the coal company knew that this land was chiefly valuable for coal before and

at the time that Mendenhall applied to purchase it, and instigated him to make his application and entry to enable them to obtain the coal from the lands by the fraudulent method pleaded. The reply contained other averments and denials which are irrelevant to the issues of law that it will be necessary to determine in this case. During the trial the plaintiff dismissed the action as against defendants Mendenhall, Howser, and Ross so that their interest in the matter no longer exists.

During the examination of Mendenhall, a witness for the defendant, after the plaintiff had rested its case in chief and before the witness had been cross-examined, the court announced that it would not submit to the jury the question whether or not the defendants were liable to the higher measure of damages recoverable for an intentional conversion of personal property, unless something very controlling, that it had overlooked, could be suggested to change its view, and thereupon directed the case to proceed upon that theory; and at the close of the trial it charged the jury that the defendants were not knowingly trespassing on land which they had no right at all to enter, and that the only amount the plaintiff could recover was the difference between the value of the coal on the cars at the mouth of the mine, and the cost of mining it and putting it there. To this and many other rulings exceptions were taken, and the jury returned a verdict against the coal company and in favor of the other defendants. One who unintentionally, and in the honest belief that he is lawfully exercising a right he has, enters upon the property of another, and removes his ore, his coal, his timber, or any other valuable appurtenant to his real estate, is liable in damages for the value of the ore, coal, timber, or other personal property in its original place, and for no more. But one who willfully and intentionally takes ore, timber, or other property of another, and appropriates it to his own use, must respond to the owner for the full value of the property taken at the time of its conversion without any deduction for the labor bestowed or expense incurred in removing and preparing it for market. There is a legal presumption that one who takes or converts to his own use the property of another intends so to do, and a jury may lawfully infer from such taking and conversion and the wrongdoer's reckless disregard of the owner's right and title that he had knowledge of that right and title, and intended to appropriate his property to his own use in the absence of persuasive evidence of his innocence and good faith. Woodenware Company v. United States, 106 U. S. 432, 1 Sup. Ct. Rep. 398, 27 L. Ed. 230; Durant Min. Co. v. Percy Consol. Min. Co., 35 C. C. A. 252, 253, 93 Fed. 166, 167; United States v. Homestake Min. Co., 54 C. C. A. 303, 304, 117 Fed. 481, 482; Golden Reward Mining Co. v. Buxton Min. Co., 38 C. C. A. 228, 237, 97 Fed. 413, 422. If there was no substantial evidence that the defendants knew that the coal which they appropriated belonged to the United States, or that they intended to convert this property to their own use which would have sustained a verdict to that effect, the court below rightly withdrew that issue from the jury. If there was evidence which would have supported such a finding, the issue of knowledge or of intent should have been submitted to the jury for their determination. Whether or not there was

such evidence may be discovered only by an examination of the record. The record discloses that there was substantial evidence at the trial of these facts: From the year 1892 to October 22, 1901, Jakway was the active general manager of the coal company and directed all its operations, and during the same time he was a member of the firm of Stubbs & Jakway, and the corporation and the firm had their offices together, so that the knowledge and intent of Jakway were the knowledge and intent of the corporation and of the firm. Between January 1, 1897, and October 22, 1901, the coal company caused many thousand tons of coal to be taken from the government land here under consideration, and sold the larger part of it to Stubbs & Jakway and the remainder to other parties. All this coal, and perhaps some coal from other sources was shipped out from the mine at a station called Hesperus. The amount shipped by the company from that station during this time was about 41,000 tons. Of this amount more than 21,000 tons were shipped to Stubbs & Jakway who were dealers in coal and who bought this coal of the corporation at the mouth of the mine. Neither Jakway, nor the corporation, nor the firm kept any separate account of the coal which they obtained from the government land, but they confused it with whatever they shipped at Hesperus from other sources so that they could not tell at the trial what part of these shipments was the property of the United States.

The coal which is the subject of this litigation was taken from lot 6 of section 12, from the northeast quarter of the northwest quarter of section 13, which adjoins lot 6 on the south, and from lot 8 of section 13, which adjoins the northeast quarter of the northwest quarter on the west. This land was formerly within the Fort Lewis Military Reservation, the north line of which ran along the north line of lot 6 about 400 feet north of the section line between sections 12 and 13, and the coal company owned lot 3 which adjoins lot 6 on the north. It had tunnel No. 2 on lot 3 through which it obtained some coal, before the taking and conversion charged in this case. Most of the coal here in controversy, if not all, was taken out through tunnel No. 3, which extended southwesterly away from the land of the coal company into the northeast quarter of the northwest quarter and lot 8 of section 13 from a portal on the south side of lot 6 within about 60 feet of the section line. The portal of tunnel No. 1, through which the company had extracted the coal on account of which the judgment was obtained against it by the plaintiff in 1895, was a few feet south of the section line and a short distance southeast of the mouth of tunnel No. 2. In the year 1892 tunnels Nos. 1 and 2 were opened, and in February or March of that year Charles W. Gibbs, a civil engineer, located and superintended the construction for the Rio Grande Southern Railway Company of a spur track of about two miles in length from its railroad to the tipple and other buildings of the coal company, which, with the exception of one boarding house, were located upon the military reservation near and probably a little south of the section line. Gibbs found the corners of the military reservation and ran out its north line along the north side of lot 6. In this way he found that the portal of tunnel No. 1 was from 200 to 500 feet south of the north line of the reservation, and he told Jakway that the tun-

nel was on the military reservation and how he knew that fact, but Jakway gave him to understand that the tunnel was located and they did not desire to throw away the work. Notwithstanding this knowledge, the coal company, by Jakway's direction took the coal out of the government land through this tunnel from June, 1892, to February, 1894, for which the former judgment was rendered.

Joseph A. Coppinger was the man in charge of the mine on the ground from 1892 until January 1 ,1895, under Jakway, who lived at Durango about 14 miles distant. Mendenhall was the brother-in-law of Jakway, and was employed by the coal company at the mine, sometimes as a clerk and sometimes as superintendent, from 1893 until 1897, and as lessee of the mine from 1897 to June 1, 1900, under a lease, whereby the company furnished its tipple, its other buildings, its track, its engine, machinery, and tools, paid the men, took all the coal and gave him the difference, which amounted to from 5 to 10 cents a ton, between the cost to it of putting the coal on the cars and $1.25 per ton for lump coal and 60 cents per ton for slack. Howser worked for the coal company at the mine most of the time from 1891 to 1904, sometimes as miner, sometimes as pit boss, and from June, 1900, until after October, 1901, as lessee under the same terms that Mendenhall acted in that capacity. Coppinger testified that from 1892 until 1897 the coal company continuously mined coal from the government land through tunnel No. 2 and from the autumn of 1897 until October 22, 1901, through tunnel No. 3 and that he estimated that it took out 40,000 tons through the latter tunnel. He further testified, and this part of his testimony was not contradicted, that in March, 1892, when Gibbs made his survey for the spur track, the latter took him and Jakway upon the land and showed them where the north line of the reservation ran, and that he was locating their premises far down on the reservation, that he had a pile of stones and a flag upon the line and that Jakway told Gibbs to go ahead with the work, that in February, 1894, Jakway told him that Keyes, the government inspector, and Dennison, the government surveyor, had arrived to survey the mine to ascertain how much coal they had taken from the reservation for the purpose of proving the amount in the action then pending therefor between the government and the coal company, and Jakway proposed to blow up tunnel No. 1, and said that the company could afford to make another tunnel much better than it could to allow the government to discover the amount of coal it had taken from the reservation, that about July, 1894, they had engaged a Mr. Tripp to survey the mine and the work in it for the coal company, and Coppinger told Jakway that according to Tripp's map the tipple, all the buildings, except one boarding house and nearly all the inside work of the coal company were upon the reservation, and Jakway told him to keep quiet about it and to tell the boys to do so. This witness further testified that when Dennison surveyed the mine in February or March, 1894, to determine the amount of coal for which the company was liable in the former suit, he asked one Brown to show him the northwest corner of the reservation, and Brown showed him the corner where the section line crossed the west line of the reservation which was about 400 feet south of the northwest corner of the reservation, and

Dennison based his survey on that mistake, and thus excluded from his estimate all the coal which had been taken from lot 6; that he told Jakway that the government surveyor had made this mistake, and had based his quantity of coal taken upon it, and Jakway had told him to say nothing about it, and to tell the boys in the office to keep quiet about it. Coppinger was undoubtedly a witness hostile to Jakway, but there is no evidence that Gibbs was, and Jakway denied none of the statements of either of these witnesses. It may be that he testified nothing concerning them because the court had held, before he was called to the stand, that it would not permit a recovery of the higher measure of damages, that the only question it would try was what coal was taken from the land and who took it, and that Jakway's knowledge and intention were immaterial. But the evidence of Jakway's knowledge and intent which has been recited was a part of the testimony at the trial, it was not contradicted, it cannot be ignored, and as it stands in this record it is near to conclusive proof that Jakway knew where the north line of the reservation was all the time after 1892, that he knew that tunnels 1 and 3, most of the land from which coal was extracted through them, the tipple, and all the buildings about the mine, but one, were within the limits of the old reservation.

About the 1st of January, 1895, Coppinger was discharged, and his brother filed a coal declaratory statement upon the lands in 1895 or 1896, and Jakway paid him $500 to relinquish his claim under it. On April 5, 1897, Mendenhall filed his application to purchase this land under the timber and stone acts, he obtained his final receipt thereunder on January 18, 1898, and his entry was canceled, because the lands were chiefly valuable for coal, on May 31, 1901. The plaintiff offered to prove that between January 1, 1894, and January 1, 1895, the coal company extracted from these lands and shipped to Stubbs & Jakway more than 45,000 tons of coal, that Mendenhall was the bookkeeper at the mine and Howser was the pit boss, that the coal company continued to mine and remove coal from these lands uninterruptedly from that time until October 22, 1901, but this evidence was rejected. There were two important issues upon which the proffered testimony was relevant and material: (1) Did Mendenhall know that this land was chiefly valuable for coal, and seek to defraud the government of it by purchasing it under the timber and stone acts; and (2) did Jakway know that the coal which the coal company and Stubbs & Jakway were obtaining was the property of the plaintiff, and that Mendenhall's application for and entry of the land were fraudulent? The evidence here offered was competent and persuasive upon both these issues, and hence it was error to reject it.

Mendenhall and Howser both testify that they supposed that the portal of tunnel No. 3 and the workings through it were upon the coal company's land, but Jakway did not testify that he thought so, and if he had, the evidence that he knew they were not would still have been in the case. They testified that Jakway was not in tunnel No. 3 more than once a year, but with his knowledge of the location of tunnel No. 2, of the tipple, and of the north line of lot 6, once was enough for him to learn that tunnel No. 3 and the excavations within it were upon the land of the United States. Moreover, he lived only 14 miles

distant, he actively managed and directed the operations at the mine, paid their cost with the checks of the coal company, directed the disposition of the coal through Mendenhall and Howser, the nominal lessees of the company, during all the time from January, 1897, until an injunction was issued in 1901. The record contains persuasive evidence that coal was taken from the land of the government here continuously from January, 1897, until the injunction issued in October, 1901, that it was taken out of tunnel No. 1 until tunnel No. 3 was opened in the winter of 1897–98, that from October, 1897, until January, 1899, the coal company extracted it at the rate of about 28 cars a day during three or four days in each week, and Mendenhall, the nominal lessee, was the bookkeeper and familiar with this fact while he was attempting to purchase this land under the timber and stone acts. In June, 1900, he turned his lease from the coal company over to Howser, and the latter acted as lessee and operator until the injunction was served in October, 1901. Was the evidence which has now been recited sufficient to sustain a finding by the jury that Jakway knew that the coal which his company and his firm obtained from these lands was the property of the United States, or that he intended that they should appropriate its coal to their use?

The legal presumption that one who takes and appropriates to his own use or to that of his principal the property of another intends so to do; the uncontradicted testimony of Gibbs that he surveyed the north line of the reservation and told Jakway that the portal of tunnel No. 2 and the sites of the buildings for the mine were far down on the reservation; the undisputed evidence of Coppinger that in February or March, 1894, when Keyes and Dennison were about to survey the prior trespass Jakway proposed to blow up tunnel No. 2, and said that the company could afford to make another tunnel better than it could to let them discover the amount of coal taken from the reservation; that he told Jakway of the mistake upon which Dennison based his survey, whereby all the coal extracted from lot 6 was excluded from his estimate, and Jakway told him to keep quiet about it; that in July, 1894, when the company caused Tripp to survey the mine, Coppinger told Jakway that according to Tripp's map their tipple, all their buildings, except one boarding house, and nearly all their inside workings were upon the reservation, and Jakway told him to keep still about it; the judgment against the coal company in 1895 for the conversion of coal taken from these lands; Jakway's continuous taking of the coal therefrom after that judgment in the name of the coal company for it and for his firm; the persuasive evidence which the continuous extraction and sale of large quantities of coal from these lands from 1892 until 1902 presents that they were chiefly valuable for coal, and that Jakway, Mendenhall, and Howser knew it when Mendenhall made and was pressing his application to purchase them under the timber and stone acts; the simulated leases whereby the coal company furnished all the means, the tipple, engine, tracks, tools, and paid the men and the expenses of operating the mine, and took or directed the shipment of all the coal while Mendenhall and Howser acted as lessees for the difference between specified prices for the coal, and the company's expense in mining it; Jakway's confusion of this coal with oth-

er coal so that he cannot tell how much came from this or other lands —compel an affirmative answer to this question. These facts were substantial and persuasive evidence that Jakway knew that this coal was the property of the government, and that he intended to appropriate it to the use of the coal company and of Stubbs & Jakway. His knowledge and intention were the knowledge and intention of the corporation and of the firm, and the court should have submitted the question to the jury whether or not they were liable for the value of any of this coal at the time and the place where they converted it.

Counsel for Jakway, and for the firm of Stubbs & Jakway, contend that if there was error in the rulings which have been considered it was not prejudicial to the plaintiff, because the jury found that these defendants never converted any of the coal, and were not liable for any damages whatever, and that since error without prejudice is no ground for reversal the judgment should not be disturbed on account of these errors. But the court in announcing its conclusion during the trial that it would not submit to the jury the plaintiff's claim for the higher measure of damages declared that it would hear no further evidence except relative to the amount of coal taken from the government land through tunnel No. 3 and relative to the parties who took and who did not take it, and in its charge to the jury it followed this ruling, and instructed them that the plaintiff could recover of those defendants who took or directed the taking of the coal from the land and from them only. This ruling was prejudicial to the plaintiff, because even if Stubbs and Jakway and the members of that firm were innocent purchasers of the coal of the plaintiff which they bought from the coal company, yet, if the latter was an intentional trespasser, the former were liable for the value of the coal at the time they bought it. Woodenware Company v. U. S., 106 U. S. 432, 435, 1 Sup. Ct. 398, 27 L. Ed. 230; Pine River Logging Company v. U. S., 186 U. S. 279, 293, 295, 22 Sup. Ct. 920, 46 L. Ed. 1164; Potter v. U. S., 58 C. C. A. 231, 235, 236, 122 Fed. 49, 54. And if Stubbs and Jakway and the members of that firm had notice or knowledge, before they bought and paid for this coal, that it had been intentionally wrongfully taken from the plaintiff by the coal company, they were liable for its value when and where they disposed of it. The wrongful taking of coal or ore from a mine or of timber from a forest does not divest the title of the owner, and the rule caveat emptor applies to all purchasers of it.

The court instructed the jury to return a verdict in favor of Stubbs probably upon its theory that no one was liable in this action who did not take or direct the taking of some of the coal from the plaintiff's land. This charge was erroneous, because Stubbs was liable for the plaintiff's coal which the coal company intentionally wrongfully took and sold or delivered to Stubbs and Jakway, whether or not Stubbs knew it was so taken. The fact is that the question whether the coal company took and sold the plaintiff's coal intentionally, wrongfully or innocently, underlay not only the measure of damages for which the coal company was liable, but it also absolutely conditioned the liability of Stubbs and Jakway and the members of that firm if they were innocent purchasers, and the erroneous failure to submit that issue to the jury is fatal to the entire judgment. While Stubbs may not

have been liable for any of plaintiff's coal which was not received and disposed of by his firm, he may be liable for that because he was a member of the partnership, and until the question of his liability as such member is determined by a trial without prejudicial error, a judgment in his favor cannot be sustained.

It is by no means certain that the reception of the rejected evidence of the continuous taking of large amounts of coal from the plaintiff's lands between 1893 and 1897, with the knowledge of Jakway, Mendenhall, and Howser, and correct rulings upon the issue of Jakway's alleged knowledge and intent and the damages which, if they existed, this knowledge and intent entailed upon Stubbs and Jakway and the members of that firm, would not have resulted in a verdict against them for the amount of the coal which they received from the coal company. The presumption is that error produces prejudice, and it is only when it is clear beyond doubt that none resulted, or could have resulted, from an erroneous ruling, that the judgment may be lawfully affirmed notwithstanding. Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; Armour & Co. v. Russell, 75 C. C. A. 416, 417, 144 Fed. 614, 615, 6 L. R. A. (N. S.) 602. It is not clear that no prejudice resulted from the refusal of the court to submit to the jury the question of the wrongful intent of Jakway and the coal company, because if that intent existed it necessarily charged Stubbs and Jakway, whether innocent or guilty of wrongful intent, with at least the value of the plaintiff's coal which they bought of the coal company at the time they purchased it.

There was no error in the refusal of the court to permit the plaintiff to amend its complaint, which had been filed in 1902, in the midst of the trial in October, 1906, so as to allege the conversion of coal between May 24, 1894, and January 18, 1897. The disposition of that motion was discretionary with the court below, and it is only reviewable here for an abuse of discretion and there was none.

There are many other alleged errors. Sixty are specified in the assignment, and it would be a useless labor to review more of them here because many, if not all, that have not been mentioned, are baseless, many of the questions which they present may not arise again, and enough has been said to extract the chief vice of the trial, and probably to insure one according to the course of the common law. The judgment below is reversed, and the case is remanded to the court below, with instructions to grant a new trial.

PHILIPS, District Judge. I dissent from the conclusion reached in the foregoing opinion in reversing the judgment as to the defendants other than the Ute Coal & Coke Company, for the reason that the verdict of not guilty as to them of the act of simple trespass is inclusive of the allegation of willful or malicious trespass. If they did not take, carry away, or appropriate the coal, as found by the jury, in my humble judgment, it requires too much of refinement for practical application to say that they participated in an act of wantonly or willfully taking, carrying away, or appropriating the same coal.