## GHOST v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.  March 30, 1909.)

### No. 2,579.

1. APPEAL AND ERROR (§§ 256, 518\*)—RECORD—MATTERS TO BE SHOWN—MOTIONS TO STRIKE OUT PORTIONS OF A PLEADING.

A motion to strike out portions of an answer and the ruling thereon cannot be regarded as part of the record, upon a writ of error, unless made such by a bill of exceptions; nor is the ruling upon such a motion open to review where no exception thereto was taken.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1489, 2352; Dec. Dig. §§ 256, 518.\*]

2. COURTS (§ 356\*)—COURTS OF THE UNITED STATES—PROCEEDINGS PREPARATORY TO OBTAINING REVIEW OF RULINGS NOT REGULATED BY STATE STATUTES.

In the courts of the United States the proceedings preparatory to obtaining a review of their rulings, including the questions of when an exception need be taken and how motions and rulings, not in themselves part of the record, may be made such, are not regulated by state statutes, but by the statutes of the United States, and, if they be silent, by the common law and the practice prevailing in those courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 937; Dec. Dig. § 356.\*]

3. MINES AND MINERALS (§ 7\*)—COAL LAND STATUTE—RIGHT TO COAL INCIDENTALLY REMOVED IN COURSE OF LAWFUL DEVELOPMENT WORK.

Under sections 2347–2352, Rev. St. (U. S. Comp. St. 1901, pp. 1440, 1441), a qualified individual or association who, in response to the government's invitation, enters upon public lands in search of coal deposits, and expends time, labor, and means in an honest effort to open and develop such deposits when found, intending to purchase the lands according to the statute if the coal proves to be such as to give character and value to them, is not a trespasser, but is in the exercise of a privilege conferred by law, and is entitled to such coal as is extracted and removed as an incident only to the reasonable prosecution of that work.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 7; Dec. Dig. § 7.\*]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Colorado.

Edwin Van Cise and Elmer E. Whitted (Frank L. Grant, on the brief), for plaintiff in error.

Ralph Hartzell, Asst. U. S. Att'y. (Earl M. Cranston, U. S. Atty., on the brief).

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

VAN DEVANTER, Circuit Judge.  In January, 1897, Allen M. Ghost purchased from prior possessory claimants a so-called coal mine upon public lands of the United States, in Colorado, the purchase including two or three hundred feet of tunnels and shafts theretofore made in an attempt to develop an outcropping vein of coal, and various improvements and appliances used in that connection.  Three days later

---

he tendered at the proper local United States land office a declaratory statement of his intention to purchase the land under the coal land law, accompanied by the requisite filing fee, and these were regularly accepted and properly noted upon the records of the office. He was qualified to acquire the land under the coal land law, and the land was subject to acquisition thereunder, if it was coal land. The so-called mine had then been idle quite a while and was in bad condition, the timber work being down, and the tunnels and shafts being choked with fallen material. Ghost put these in proper condition, added materially to the improvements and appliances, and extended the development work much farther into the earth, all in an industrious effort to ascertain whether the land was valuable for coal. As exposed in the original workings, the outcropping vein had a total thickness of four feet, less than half of it being good coal and the balance waste. What was thus exposed was not sufficient to make the land of practical value for coal mining, and Ghost continued the development work in the belief or hope that as the vein was followed into the earth it would improve sufficiently to make the mining of it profitable. But in this he was disappointed, for the development work done by him demonstrated that the vein did not improve, and he permitted his declaratory statement to expire by limitation, without purchasing the land. In the course of his development work, and during the life of his declaratory statement, he extracted and removed from the land 1,800 tons of lump coal and 900 tons of slack coal, which he sold at $2 and $1.25 per ton, its value on the cars at a nearby railway station. After his declaratory statement expired, the United States brought an action against him for the alleged conversion of the coal so extracted and sold, and upon the trial, where the matters here stated appeared in evidence, the jury, under the court's direction, returned a verdict for the government for the full value of the coal at the place of sale. The present writ of error challenges the judgment rendered upon that verdict.

Various objections were made to the complaint, one count in which is said to have been for trespass upon realty and the other for conversion of personalty. Of the rulings upon these objections it suffices to say that each count adequately stated a cause of action for conversion; and nothing more, within the rule applied in United States v. Ute Coal & Coke Co., 158 Fed. 20, 85 C. C. A. 302, and that, although one of them might well have been eliminated, the record affirmatively discloses that no harm resulted from the presence of both.

Error is assigned upon the striking out of portions of the defendant's answer upon the plaintiff's written motion, but that ruling is not open to review upon the present record, because, first, the motion and the ruling thereon could be made part of the record only by a bill of exceptions (Dietz v. Lymer, 61 Fed. 792, 10 C. C. A. 71; England v. Gebhardt, 112 U. S. 502, 5 Sup. Ct. 287, 28 L. Ed. 811; Evans v. Stettnisch, 149 U. S. 605, 13 Sup. Ct. 931, 37 L. Ed. 866; Metropolitan R. R. Co. v. District of Columbia, 195 U. S. 322, 25 Sup. Ct. 28, 49 L. Ed. 219; Wike v. Campbell, 5 Colo. 126; Whitney v. Teichfuss, 11 Colo. 555, 19 Pac. 507; Rutter v. Shumway, 16 Colo. 95, 26 Pac. 321), which was not done; and, second, if that omission could be disregard-

ed, an exception to the ruling would still be essential (Rodriguez v. United States, 198 U. S. 165, 25 Sup. Ct. 617, 49 L. Ed. 994), and none is shown. Counsel for the defendant, while recognizing that these omissions ordinarily would be fatal, rely upon a Colorado statute (Mills' Ann. Code, § 387) which declares:

"No exceptions need be taken to opinions or decisions of courts of record sustaining or overruling demurrers or written motions affecting or based on the pleadings, or overruling motions in arrest of judgment, motions for new trials or for continuance of causes, or giving, refusing or modifying instructions; but all such opinions and decisions together with the demurrers, motions and instructions, shall be taken as a part of the record, without being made such by a bill of exceptions."

But in the courts of the United States the question of when an exception need be taken, and the further question of how motions and rulings, not in themselves part of the record, may be made such, are not determined by state statutes, but by the statutes of the United States, and, if they be silent, by the common law and the practice prevailing in those courts. As well in point, we quote from Chateaugay Ore & Iron Co., Petitioner, 128 U. S. 544, 553, 555, 9 Sup. Ct. 150, 152, 153, 32 L. Ed. 508, as follows:

"We are of opinion that the practice and rules of the state court do not apply to proceedings in the Circuit Court taken for the purpose of reviewing in this court a judgment of the Circuit Court, and that such rules and practice, embracing the preparation, perfecting, settling, and signing of a bill of exceptions, are not within the 'practice, pleadings, and forms and modes of proceeding' in the Circuit Court, which are required by section 914 of the Revised Statutes (U. S. Comp. St. 1901, p. 684), to conform 'as near as may be' to the 'practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the state' within which the Circuit Court is held, 'any rule of court to the contrary notwithstanding.'

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"The manner or time of taking proceedings as a foundation for the removal of a cause by a writ of error from one federal court to another is a matter to be regulated exclusively by acts of Congress, or, when they are silent, by methods derived from the common law, from ancient English statutes, or from the rules and practice of the courts of the United States."

And as equally apposite we extract the following from the opinion in St. Clair v. United States, 154 U. S. 134, 153, 14 Sup. Ct. 1002, 1010, 38 L. Ed. 936:

"What is necessary to be done in a Circuit Court, even in civil cases, in order that its action upon any particular question or matter may be reviewed or revised in this court, depends upon the acts of Congress and the rules of practice which this court recognizes as essential in the administration of justice."

These decisions were followed and applied by this court in the recent case of Francisco v. Chicago & A. R. Co., 149 Fed. 354, 79 C. C. A. 292.

Considerable evidence was offered by the defendant which tended substantially to show that in all that was done by him he acted in good faith, with the sole purpose of ascertaining whether or not the land was valuable for coal, and with intent, if it was, to purchase it under the coal land law during the life of his declaratory statement; that he

believed what he was doing was within the law and the regulations of the Land Department; that he ceased operations and permitted his declaratory statement to expire without purchasing the land because it did not prove to be valuable for coal; that in that vicinity there were some developed coal measures which influenced him to undertake and continue his development work; that what was done by him was reasonably necessary to the proper ascertainment of the character of the land, and that the price obtained for the coal extracted and sold was less than the cost of extracting it and getting it to the place of sale. All of this evidence was excluded, save that one of the defendant's witnesses who had the development work in charge was permitted to testify as follows:

"Q. I will ask you whether or not there was any work done there during the time you were superintendent that was not done for the purpose of opening and developing this property and demonstrating, if possible to do so, that it was valuable for coal. A. My instructions were to discover, if possible, whether that could be made a paying vein of coal; not to attempt to make any profit at present, but to discover if the vein and the property was worth the government price—$20 an acre. Q. What did you do in pursuance of those instructions? A. We spent the most of our efforts in the entry, forcing that into the hill, hoping to get a more regular vein, and during the course of that work the vein would thicken up a little and we would strike those pockets where the coal would be 32 inches thick, hard coal, and, of course, we always hoped that it would get the full thickness—four feet; and then all at once it would jump back to its minimum thickness. Q. Of what? A. 12 inches. * * * Q. Was or was not it necessary in the course of this development sometimes to take out waste in order to make the tunnel or the drift passable for men? A. It all came out. Q. Was it necessary to take it out to make room? A. Yes, sir, and it was very combustible. * * * Q. Was there any work done there during the time that you were superintendent, except in opening and developing that property? A. No, there was no work done except to develop, if possible, a coal mine—a paying vein. Q. Did you ever succeed in that? A. No, sir."

The defendant himself had testified that, at the time of his purchase of the so-called mine, it was in the condition hereinbefore described, and he sought to show its condition at that time by another witness who was familiar with it, but this evidence was also excluded.

Whether or not there was error in the exclusion of the evidence so offered is the principal question presented upon this record, and its solution must be sought in the law regulating the disposal of public coal lands and in the regulations promulgated thereunder. That law is embraced in sections 2347 to 2352, inclusive, of the Revised Statutes (U. S. Comp. St. 1901, pp. 1440, 1441), and so much of it as is here material may be summarized as follows: Every qualified person, and every association of persons severally qualified, shall have the right, upon application at the proper land office, to purchase any quantity of public "coal lands," not exceeding 160 acres to an individual or 320 acres to an association (section 2347); and every such person or association who shall "open and improve any coal mine or mines" upon the public lands and shall be in "actual possession" of the same shall have a preference right to purchase the "mines so opened and improved" (section 2348). A declaratory statement or notice of every preference right must be filed in the proper land office within 60 days after the date of "actual possession and the commencement of improvements"

(section 2349), and the right must be perfected by making due proof thereof and paying the requisite purchase price within one year from the time prescribed for filing the declaratory statement or notice (section 2350). If there be conflicting claims to the same land, priority of "possession and improvement," followed by proper filing and "continued good faith," shall determine the right to purchase (section 2351).

The regulations authoritatively issued under the law and in force at the time, so far as they are material here, are as follows (1 Land Dec. Dep. Int. 547):

"(16) Any duly qualified person or association must be preferred as purchasers of those public lands on which they have opened and improved, or shall open and improve, any coal mine or mines, and which they shall have in actual possession."

"(18) The opening and improving of a coal mine, in order to confer a preference-right of purchase, must not be considered as a mere matter of form; the labor expended and improvements made must be such as to clearly indicate the good faith of the claimant.

"(19) These lands are intended to be sold, where there are adverse claimants therefor, to the party who, by substantial improvements, actual possession, and a reasonable industry, shows an intention to continue the development of the mines in preference to those who would purchase for speculative purposes only. * * *

"(20) In conflicts, where improvements have been or shall hereafter be commenced, priority of possession and improvement shall govern the award when the law has been fully complied with by each party. A mere possession, however, without satisfactory improvements, will not secure the tract to the first occupant when a subsequent claimant shows his full compliance with the law."

"(32) Each claimant at the time of actual purchase must make affidavit as follows: * * * I further swear that I have expended in developing coal mines on said tract in labor and improvements the sum of ———— dollars, the nature of such improvements being as follows: * * * That I am now in the actual possession of said mines * * *: that my knowledge of said land is such as to enable me to testify understandingly with regard thereto; that the same is chiefly valuable for coal. * * *"

And not only did the regulations then in force require an applicant to make proof at the time of actual purchase that the land was "chiefly valuable for coal," but the regulations since adopted call for proof that the lands contain "workable deposits of coal." Regulations 1907, pars. 2, 10, 14, in 35 Land Dec. Dep. Int. 667. Besides, the uniform interpretation of the statute has been that it does not admit of the purchase of public lands as "coal lands" unless they contain coal of such quality and in such quantity as reasonably to warrant the conclusion that it is capable of being profitably mined or worked. Savage v. Boynton, 12 Land Dec. Dep. Int. 612; Rucker v. Knisley, 14 Id. 113; Scott v. Sheldon, 15 Id. 361; Hamilton v. Anderson, 19 Id. 168; Davis v. Tanner, 20 Id. 220; McKibben v. Gable, 34 Id. 178, 182; Letter of Instructions, 34 Id. 194, 203; Colorado Coal & Iron Co. v. United States, 123 U. S. 307, 325, 328, 8 Sup. Ct. 131, 31 L. Ed. 182.

With this understanding of what lands are purchasable as "coal lands," it is not difficult to appreciate the statute in other respects. Subject to limitations not now in question, it plainly invites individuals and associations to enter upon the public lands in search of coal deposits, to take possession of lands in which they find such deposits, and to expend time, labor, and means in opening and developing them, provid-

ing only that there be an honest intent or purpose to purchase the lands according to the statute, if the coal proves to be such as to give character and value to them. And, this being so, it follows necessarily that one who, within the prescribed limitations, in good faith accepts and acts upon the statutory invitation with an intent or purpose so to purchase, must be regarded as in the exercise of a privilege conferred by law, and not as a trespasser. This much is conceded in the government's brief, for it is there frankly said:

"The right to explore for coal for the purpose of ascertaining the desirability of filing upon the land is, of course, admitted, as well as the right to pursue legitimate operations in the way of discovery and development during the period of time limited by the statute."

But it is urged that the court's rulings in excluding the evidence before described should be sustained for these reasons: (1) A mine was opened and developed upon the land in question when the defendant entered thereon, and the purpose of his subsequent operations was not to ascertain whether the land was valuable for coal, and, if so, to purchase according to the statute, but to appropriate the coal to his own benefit, without any regard to the statute. (2) Even if his operations and his purpose were within the statute, he was not entitled to the coal removed in the course of those operations, unless he purchased the land according to the statute.

The first proposition might be dismissed by saying that it assumes as true a state of facts which is the very contrary of what the evidence offered and excluded tended to show. But it properly may be added that the assumption has little substantial support in the evidence admitted. It is of no moment that the original workings were spoken of as a "mine," for the undisputed evidence relating to what was disclosed in them indicates that whether or not the land was valuable for coal was still an open question when the defendant began his operations. And, while the quantity of coal removed seems large to one inexperienced in such matters, there was some evidence that its removal was reasonably essential to the proper ascertainment of the character of the vein and there was no evidence to the contrary.

The second proposition presents a question of law which seems not to have been directly determined, and yet is not difficult of solution if regard be had to the settled rules of law applied in analogous cases. An individual or association lawfully engaged in opening and developing coal deposits upon public lands is in much the same situation, as respects the coal removed in the proper course of that work, as is a tenant for life or years, as respects timber cut in rightfully clearing the land. If there be no agreement to the contrary, the tenant becomes the the owner of the timber so cut and may sell it, although he is not entitled to cut for purposes of sale (1 Washburn, Real. Prop. *109; 1 Taylor's Landlord & Tenant [8th Ed.] § 353); and by analogy, there being no provision to the contrary in the statute, we think an individual or association lawfully engaged in opening and developing coal deposits upon public lands becomes the owner of the coal removed in the proper course of that work, and may sell it, although it could not be lawfully removed for purposes of sale. In principle, this conclu-

sion is sustained by controlling decisions in cases not reasonably distinguishable from this. Thus in United States v. Cook, 19 Wall. 591, 593, 22 L. Ed. 210, wherein was brought in question the right of Indians to cut and sell timber from lands of the United States set apart for their use and occupancy, it was said:

"This right of use and occupancy by the Indians is unlimited. They may exercise it at their discretion. If the lands in a state of nature are not in a condition for profitable use, they may be made so. If desired for the purposes of agriculture, they may be cleared of their timber to such an extent as may be reasonable under the circumstances. The timber taken off by the Indians in such clearing may be sold by them. But to justify any cutting of the timber, except for use upon the premises, as timber or its product, it must be done in good faith for the improvement of the land. The improvement must be the principal thing, and the cutting of the timber the incident only. Any cutting beyond this would be waste and unauthorized.

"The timber while standing is a part of the realty, and it can only be sold as the land could be. The land cannot be sold by the Indians, and consequently the timber, until rightfully severed, cannot be. It can be rightfully severed for the purpose of improving the land, or the better adapting it to convenient occupation, but for no other purpose. When rightfully severed it is no longer a part of the land, and there is no restriction upon its sale. Its severance under such circumstances is, in effect, only a legitimate use of the land. In theory, at least, the land is better and more valuable with the timber off than with it on. It has been improved by the removal. If the timber should be severed for the purposes of sale alone—in other words, if the cutting of the timber was the principal thing and not the incident—then the cutting would be wrongful, and the timber, when cut, become the absolute property of the United States."

And in Shiver v. United States, 159 U. S. 491, 16 Sup. Ct. 54, 40 L. Ed. 231, wherein was brought in question the right of a homestead claimant, in advance of final entry, to cut and sell timber from the land embraced in his preliminary entry, the court, while holding that such a claimant is bound to act in good faith to the government and has no right to cut the timber for purposes of sale, fully recognizes that he is entitled to clear the land for cultivation, and becomes the owner of such timber as is necessarily cut in so doing. Application of this doctrine was further made in Stone v. United States, 167 U. S. 178, 192, 194, 17 Sup. Ct. 778, 783, 784, 42 L. Ed. 127, where a charge to a jury containing the following was given the fullest approval:

"That any settler going upon a tract of land with that intention (to obtain title by compliance with homestead or pre-emption law) goes by invitation of the government, and with the authority to improve the land and make it fit for use; that he is authorized to cut down the timber which he finds standing there (if it incumbers the ground), so far as is necessary to do so in order to make the land fit for cultivation; that any timber that he does so cut down in good faith and for the purpose of improving the land, he being a bona fide settler intending to acquire title in accordance with the laws, is not the property of the United States, but becomes his property after being so cut down, and that he may burn it up or he may sell it for money, and if he sells it under the conditions named the man who buys it from him gets a good title and is not required to pay the United States for it afterwards; that the converse of that proposition is true, and where a man cuts timber off the public lands, unless he is a bona fide settler intending to acquire title to the lands by obedience to the laws of the United States, he does so unlawfully, and does not make himself the owner of the timber by cutting it; and that even a settler who takes up a claim on public lands, intending to perfect his right to it, has no right, until he has perfected his

claim, to cut the timber, except so far as it is necessary and reasonable to prepare so much of the lands for cultivation as he intends to cultivate.

\* \* \* \* \* \* \* \* \* \* \* \*

"The fact that claimants to lands under the homestead and pre-emption laws after occupation for a time abandon the lands is not alone proof that they intended to defraud the government, although in the meantime they have cut and sold the timber from the lands during the occupation, but the jury should judge of the intent of the parties so acting by all the circumstances surrounding each case, and if these circumstances satisfy the jury that claimants of the land were acting in good faith at the time they sold the timber, and the purchaser had no reasonable ground ·to believe otherwise, then such sale would be lawful."

In view of these decisions and the obvious purpose and spirit of the coal land statute, we entertain no doubt that a qualified individual or association who, in response to the government's invitation, enters upon public lands in search of coal deposits, and expends time, labor, and means in an honest effort to open and develop such deposits when found, intending to purchase the lands according to the statute, if the coal proves to be such as to give character and value to them, becomes the owner of such coal as is extracted and removed as an incident only to the reasonable prosecution of that work.

It follows that the evidence in question ought not to have been excluded, because, if true, it would have established a complete defense to the action; and, as the burden of proof in that connection was upon the defendant (see Northern Pacific R. R. Co. v. Lewis, 162 U. S. 366, 375–378, 16 Sup. Ct. 831, 40 L. Ed. 1002; United States v. Denver & Rio Grande R. R. Co., 191 U. S. 84, 24 Sup. Ct. 33, 48 L. Ed. 106), the exclusion was highly prejudicial to him.

In directing a verdict for the government, the court seems to have proceeded upon the theory that the evidence conclusively established that the original workings which were upon the land when the defendant began his operations constituted a fully opened and developed coal mine within the meaning of the statute, but, for reasons before stated, we think that theory has little substantial support in the evidence.

The judgment must be reversed, with a direction to set aside the verdict and to grant a new trial; and it is so ordered.